Filed 8/12/13

# IN THE SUPREME COURT OF CALIFORNIA

AMERICAN NURSES ASSOCIATION et al.,

        Plaintiffs and Respondents,

        v.

TOM TORLAKSON, as Superintendent, etc., et al.,

        Defendants and Appellants;

AMERICAN DIABETES ASSOCIATION,

        Intervener and Appellant.

S184583

Ct.App. 3 C061150

Sacramento County
Super. Ct. No. 07AS04631

Public school students with diabetes who cannot self-administer insulin are normally entitled under federal law to have it administered to them during the school day. This case presents a dispute over whom state law permits to administer that insulin. The dispute arises against the background of a long-standing shortage of school nurses and a class action in federal court alleging the state's schools have failed to ensure diabetic students actually receive legally required health care services. Pursuant to an agreement settling that litigation, the State Department of Education (Department) in 2007 advised local education agencies that trained school personnel who are not licensed health care providers may, when no nurse is available, administer insulin pursuant to the medical orders

1

of students' treating physicians. (State Dept. of Ed., Legal Advisory on Rights of Students with Diabetes in California's K-12 Public Schools (2007) pt. IV.C < http://www.cde.ca.gov/ls/he/hn/legaladvisory.asp > [as of Aug. 12, 2013] (2007 Legal Advisory).) In the case now before us, the American Nurses Association and other trade organizations representing registered and school nurses (collectively Nurses) challenge the Department's advice as condoning the unauthorized practice of nursing. The American Diabetes Association (Association), which is a party to the federal settlement agreement, defends the Department's advice as intervener.

In fact, California law expressly permits trained, unlicensed school personnel to administer prescription medications such as insulin in accordance with the written statements of a student's treating physician and parents (Ed. Code, §§ 49423, 49423.6; Cal. Code Regs., tit. 5, §§ 600, 604, subd. (b)) and expressly exempts persons who thus carry out physicians' medical orders from laws prohibiting the unauthorized practice of nursing (Bus. & Prof. Code, § 2727, subd. (e)). Through these provisions, state law in effect leaves to each student's physician, with parental consent, the question whether insulin may safely and appropriately be administered by unlicensed school personnel, and reflects the practical reality that most insulin administered outside of hospitals and other clinical settings is in fact administered by laypersons. The Nurses' arguments to the contrary lack merit.

## I. BACKGROUND

The question whether California law permits unlicensed school personnel to administer medications is, like all questions of law, subject to de novo review. (See *Bruns v. E-Commerce Exchange, Inc.* (2011) 51 Cal.4th 717, 724.) We thus draw freely from the undisputed evidence in setting out the facts of the case before us.

2

Diabetes is a chronic, incurable disease that prevents the human body from properly using food to produce energy. Insulin, a hormone produced in the pancreas, transports glucose (a sugar derived from food) through the bloodstream to the cells. In a person with diabetes, the body either does not produce insulin, or enough insulin (type 1 diabetes), or cannot use insulin properly (type 2 diabetes). All persons with type 1 diabetes and some with type 2 must take insulin to avoid serious short- and long-term health problems. (See generally U.S. Dept. of Health & Human Services, Helping the Student with Diabetes Succeed: A Guide for School Personnel (2010) p. 1 < http://www.ndep.nih.gov/media/youth_schoolguide.pdf > [as of Aug. 12, 2013] (DHHS Guide).) State law requires that nurses administer all medications, including insulin, in hospitals and other licensed health care facilities. (Bus. & Prof. Code, § 2725.3.) Outside of such facilities, however, insulin is normally administered by laypersons according to a physician's directions, most often by the diabetic persons themselves or by friends or family members.

Public school students with diabetes who cannot self-administer insulin are normally entitled to have it administered to them at no cost. This is a result of section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794) (Section 504), title II of the Americans with Disabilities Act (42 U.S.C. § 12131 et seq.), and the Individuals with Disabilities Education Act (20 U.S.C. § 1400 et seq.) (IDEA). (See 28 C.F.R. § 35.104 (2013); 34 C.F.R. § 300.8(c)(9)(i) (2013) [defining diabetes as a disability].) Public schools must offer to students covered by these laws a free and appropriate public education that includes related aids and services, such as medical services, designed to meet their individual educational needs. (See 20 U.S.C. § 1400(d)(1)(a), 34 C.F.R. § 104.33(a), (b)(1) (2012) .) Under these laws, diabetic students pay for insulin, supplies and equipment but not the cost of administering insulin. (See 34 C.F.R. 104.33(c)(1) ["the provision of a

3

free education is the provision of educational and related services without cost to the handicapped person or to his or her parents or guardian"]; *Cedar Rapids Community School Dist. v. Garret F.* (1999) 526 U.S. 66, 79 [school district must pay for required services].) A school's obligations to a particular diabetic student are normally set out in a "Section 504 plan" or an "individualized education program" (IEP).

Approximately one in 400 school-age children nationwide has diabetes, including about 14,000 in California. The goal of diabetes management for children is to avoid both hyperglycemia (high blood glucose) and hypoglycemia (low blood glucose) by tightly maintaining blood glucose levels within target ranges determined by their physicians, through frequent monitoring and multiple daily insulin injections. (DHHS Guide, p. 15.) Accordingly, diabetic students who depend on insulin injections typically need them during the schoolday, both at regularly scheduled times and unpredictably to correct for fluctuations in blood glucose. The need for insulin can arise anytime and anywhere — in the classroom, on field trips or during school-sponsored activities. To serve this and other student health needs, California has about 2,800 school nurses, averaging one for every 2,200 of the state's approximately 6 million public school students. While 5 percent of schools have a full-time school nurse, 69 percent have only a part-time nurse, and 26 percent have no nurse at all. Although some schools allow unlicensed school personnel to administer insulin, others do not. Some of those that do not appear to have taken the position, possibly in reliance on 2005 and 2006 advisory statements by the Department (see *post*, at p. 21 et seq.), that the Nursing Practice Act (Bus. & Prof. Code, § 2700 et seq.) permits only licensed health care providers to administer insulin in schools. Moreover, some nurses have refused to train unlicensed school personnel to administer insulin out of concern for possible disciplinary action by the Board of Registered Nursing. As a

4

result, diabetic students have encountered difficulty in receiving insulin during the schoolday.

In October 2005, the parents of four diabetic students in California public schools, together with the Association, filed a class action in federal court alleging that schools in the Fremont Unified School District and the San Ramon Valley Unified School District had failed to meet their obligations to diabetic students under federal law. (*K.C. et al. v. O'Connell* (N.D.Cal., C-05-4077MMC).) The defendants included the Department, the State Superintendent of Public Instruction (Superintendent), the members of the State Board of Education (Board), and officials of the two named school districts. Plaintiffs alleged the districts' schools had refused to prepare Section 504 plans for diabetic students, refused to include provisions for diabetes care in students' IEPs, refused to permit unlicensed school personnel to administer insulin when no nurse was available, and improperly required that parents or parental designees come to school to administer insulin. Because of these asserted violations of federal law, plaintiffs further alleged, some parents were required to forego employment and some students had to adopt insulin regimens that entailed less frequent injections, less effective control of blood glucose levels, and greater risks to their health.

In July 2007, the plaintiffs in the federal litigation entered into a settlement agreement with the Department, the Superintendent and the Board. The agreement required the Department, among other things, to fulfill its legal obligations to monitor local education agencies' compliance with Section 504 and the IDEA and to resolve complaints of noncompliance. In addition, and more importantly for present purposes, the Department agreed to issue the 2007 Legal Advisory (see *ante*, p. 2) summarizing the rights of diabetic students under federal and state law. The Department issued that document in August 2007, and the federal court dismissed the action.

In the 2007 Legal Advisory, as relevant here, the Department articulates eight categories of persons authorized to administer insulin to students in the state's public schools. The Department describes the first seven categories as specifically authorized in statutory exceptions to the Nursing Practice Act (Bus. & Prof. Code, §§ 2725, subd. (b)(2), 2727, subd. (d)) and in a regulation concerning the administration of medication adopted by the Board (Cal. Code Regs., tit. 5, § 604). Briefly, those seven categories include: (1) students who are able to self-administer, (2) nurses and physicians employed by local education agencies, (3) other school employees who are appropriately licensed health care providers, (4) licensed nurses working pursuant to contracts with schools, (5) parents and guardians, (6) persons designated by parents or guardians who are volunteers but not school employees, and (7) trained, unlicensed school employees acting in emergencies. (2007 Legal Advisory, pt. IV.A.)

The 2007 Legal Advisory also recognizes that some students cannot self-administer insulin, that licensed health care providers are not always available when needed, and that federal law does not permit schools to impose the cost of administering insulin on parents. On that basis, the Department concludes as follows: "When federal and state laws are reconciled, it is clear that it is unlawful for [a local education agency] to have a general practice or policy that asserts it need not comply with the IDEA or Section 504 rights of a student to have insulin administered at school simply because a licensed professional is unavailable. In such situations, federal rights take precedence over strict adherence to state law so that the educational and health needs of the student protected by the Section 504 Plan or IEP are met." (2007 Legal Advisory, par. IV.C.) So concluding, the Department adds an eighth category of authorized persons, permitting insulin to be administered by a "voluntary school employee who is unlicensed but who has been adequately trained to administer insulin pursuant to the student's treating

6

physician's orders as required by the Section 504 Plan or the IEP." (2007 Legal Advisory, Checklist.) The validity of the 2007 Legal Advisory's "category 8" is the crux of the present dispute.

Two months after the Department issued the 2007 Legal Advisory, the Nurses challenged that document by filing the present action in the superior court seeking declaratory relief and a writ of mandate. The Association responded with a complaint in intervention asking the court to dismiss the Nurses' action. Ultimately the court entered judgment for the Nurses. Accepting their argument that state law does not authorize unlicensed school personnel to administer insulin, the court declared the 2007 Legal Advisory invalid to that extent and directed the issuance of a writ of mandate ordering the Superintendent and the Department not to enforce it. The court also declared the same portion of the 2007 Legal Advisory invalid as a regulation adopted in violation of the Administrative Procedure Act (Gov. Code, § 11340 et seq.) (APA). Finally, the court rejected the Association's argument that state law, if interpreted as forbidding unlicensed personnel to administer insulin, is preempted by Section 504 and the IDEA.

The Association appealed. The appeal automatically stayed the superior court's decision, leaving the 2007 Legal Advisory provisionally in effect pending the final outcome of these proceedings. (Code Civ. Proc., § 916, subd. (a).) The Court of Appeal affirmed the judgment and writ of mandate without reaching the APA issue. We granted the Association's petition for review. The Superintendent and District, who did not petition for review, support the Association's position as amici curiae.

## II. DISCUSSION

The main question before us is whether California law permits unlicensed school personnel to administer insulin. Our affirmative answer to that question leaves no need to decide whether federal law would preempt a contrary rule of

7

state law or whether the Department violated the APA in promulgating the 2007 Legal Advisory.

**A. California Law.**

To determine whether unlicensed school personnel may administer prescription medications such as insulin, we first consult the body of law that expressly purports to answer the question: Education Code section 49423 and its implementing regulations. (All further undesignated citations to statutes are to this code.) The statute declares the basic law: "[A]ny pupil who is required to take, during the regular schoolday, medication prescribed for him or her by a physician and surgeon . . . may be assisted by the school nurse *or other designated school personnel* . . . ." (§ 49423, subd. (a), italics added.) The same statute ensures that medications are administered only in accordance with medical orders and parental consent: "In order for a pupil to be assisted by a school nurse *or other designated school personnel* pursuant to subdivision (a), the school district shall obtain both a written statement from the physician . . . detailing the name of the medication, method, amount, and time schedules by which the medication is to be taken and a written statement from the parent, foster parent or guardian of the pupil indicating the desire that the school district assist the pupil in the matters set forth in the statement of the physician . . . ." (*Id.*, subd. (b), italics added.) Section 49423 expressly applies "[n]otwithstanding section 49422," which provides more generally that only licensed health care providers may be "permitted to supervise the health and physical development of pupils" (§ 49422, subd. (a)).

In adopting section 49423, the Legislature repealed and reenacted former section 11753.1. (Stats. 1968, ch. 681, § 1, p. 1378, repealed and reenacted as § 49423 by Stats. 1976, ch. 1010, § 2, p. 3615.) The Legislature's reason for authorizing school personnel to administer medications, according to the original statute's legislative history, was to avoid requiring children "to leave school

8

during the day for necessary medication" or compelling their parents "to pay extra sums for a school visit by the physician." (Assem. Ed. Com., Analysis of Assem. Bill No. 1066 (1968 Reg. Sess.) p. 1.)

Section 49423, like its statutory predecessor, did not require implementing regulations and was thus self-executing. In the ensuing decades, however, some schools refused to administer prescribed medication to students. Noting this, the Superintendent in a 1997 letter to school superintendents reminded local school administrators that federal law permitted students to receive medication during the schoolday, and that medication could properly be administered by unlicensed "personnel who have been appropriately trained by a credentialed school nurse, public health nurse, or physician." (Superintendent Eastin, letter to superintendents of schools (Sept. 5, 1997) p. 2.) Three years later, the same problem came to the attention of the Legislature. A Senate floor analysis, recognizing that "federal case law requires districts to accept responsibility to administer necessary medications," reported complaints that "some districts 'have required parents to sign illegitimate blanket waivers that sign away their children's right to medical treatment at school as a condition of enrollment or attendance. In these instances, parents have been forced to take time off work to go to school and deliver the medications.' " (Sen. Rules Com., Analysis of Sen. Bill No. 1549 (1999-2000 Reg. Sess.) Aug. 14, 2000, p. 3.) To provide additional clarity, the Legislature directed the Department to develop and recommend, and the Board to adopt, regulations "regarding the administration of medication in the public schools pursuant to section 49423." (§ 49423.6, subd. (a), added by Stats. 2000, ch. 281, § 2, p. 2477.)

Obeying the Legislature's command, the Board in 2003 adopted sections 600 to 611 of title 5 of the California Code of Regulations. (All further references to title 5 are to that code.) These regulations expressly declare that unlicensed school

9

personnel may administer medications.  Section 604 provides:  "(a) A school nurse may administer medication to a pupil or otherwise assist a pupil in the administration of medication as allowed by law and in keeping with applicable standards of professional practice.  [¶]  (b) *Other designated school personnel may administer medication to pupils* or otherwise assist pupils in the administration of medication as allowed by law and, if they are licensed health care professionals, in keeping with applicable standards of professional practice for their license."  (Tit. 5, § 604, subd. (b), italics added.)  Section 601 defines the " '[o]ther designated school personnel' " who are thus authorized to act as "includ[ing] *any individual employed by the local education agency who*:  [¶]  (1) *Has consented to administer the medication to the pupil* or otherwise assist the pupil in the administration of the medication; and  [¶]  (2) May legally administer the medication to the pupil or otherwise assist the pupil in the administration of the medication."  (*Id.*, § 601, subd. (e), italics added.)  Other sections of title 5 provide for such related matters as medication logs and records, the contents of the physicians' and parents' required written statements, and the delivery, storage and disposal of medications. (*Id.*, §§ 601-609.)

Thus, section 49423 and its implementing regulations plainly establish, as the Legislature, the Board and the Department intended, that unlicensed school personnel may administer prescription medications.  The Nurses do not contend the Board's regulations are invalid, but they do offer a variety of arguments for interpreting them other than according to their plain meaning.  None is persuasive.

### 1. *"[A]s allowed by law."*

In permitting school personnel other than licensed health care providers to administer medication, sections 601 and 604 of title 5 qualify that permission with language deferring to other laws governing the subject.  Specifically, section 604 provides that "[o]ther designated school personnel may administer medication to

10

pupils . . . *as allowed by law*." (*Id.*, subd. (a), italics added.) Similarly, section 601 limits such " '[o]ther designated school personnel' " to those who "[*m*]*ay legally administer the medication to the pupil . . . .*" (*Id.*, subd. (e)(2), italics added.) The Nurses contend the italicized language means that only those school personnel who are licensed health care providers, such as registered nurses, may administer medications, and that unlicensed personnel may assist but not actually administer medications. By way of illustration, the Nurses assert that unlicensed school personnel "are permitted to open a bottle of cough syrup and pour the prescribed dose but cannot pour it down the student's throat," or they may monitor a diabetic student's glucose levels and determine the correct dosage of insulin but may not administer the drug by giving the injection or pushing the button on an insulin pump.

The Nurses have misinterpreted the regulations. Before explaining that conclusion, however, and in order to clarify the scope of our holding, we note that one significant premise of the Nurses' argument is correct: There is no reason to believe the Legislature intended to delegate to the Board, a state educational agency charged with governing the public schools (see §§ 33000, 33031), any authority to override statutes in which the Legislature has required specific licensure before a person may perform a health care function. We assume the Board shares this understanding. In section 610 of title 5, the Board explains that "[n]othing in this article may be interpreted as . . . affecting in any way: [¶] (a) The statutes, regulations, or standards of practice governing any health care professional licensed by the State of California in the carrying out of activities authorized by the license . . . ." Viewed in this light, the language in the Board's regulations that qualifies the authority of unlicensed school personnel to administer medications — "as allowed by law" (tit. 5, § 604, subd. (a); see also *id.*, § 601, subd. (e)(2)) — is reasonably and appropriately interpreted as reflecting

11

the Board's deference to laws articulating policy choices that lie beyond the scope of its delegated authority over the state's public schools.

This does not mean, however, that only licensed health care professionals may administer prescription medications in public schools.  It means, rather, only that the Board's regulations do not authorize unlicensed school personnel to administer such medications *in violation of other applicable laws or regulations*. To illustrate, only licensed health care providers may administer controlled substances.  (See Health & Saf. Code, § 11154, subd. (a).)  Also, the Legislature has mandated specific training before unlicensed school personnel may administer three specially regulated emergency medications to students.  (See §§ 49414 [epinephrine auto-injectors for anaphylaxis], 49414.5 [glucagon for severe hypoglycemia] and 49414.7 [antiseizure medication for epilepsy].)  A school employee without the licensure or training required by statute for such medications would not be "allowed by law" (tit. 5, § 604, subd. (a)) to administer them and, thus, not permitted to do so solely by force of the Board's regulations. Compliance with those other laws would also be necessary.

In contrast, no such law prohibits unlicensed persons from administering prescription medications generally, or insulin in particular, in carrying out the medical orders of licensed physicians.  The Nurses attempt to find such a rule in the Nursing Practice Act (Bus. & Prof. Code, § 2700 et seq.) (NPA), which defines the practice of nursing to include a list of patient care functions including "the administration of medications" (*id.*, § 2725, subd. (b)(2)), and prohibits the unauthorized practice of nursing (*id.*, § 2732).  In opposition, the Association contends the listed functions fall within the definition of nursing practice only under circumstances where they "require a substantial amount of scientific knowledge or technical skill."  (*id.*, § 2725, subd. (b) ["The practice of nursing within the meaning of this chapter means those functions, including basic health

12

care, that help people cope with difficulties in daily living that are associated with their actual or potential health or illness problems or the treatment thereof, *and that require a substantial amount of scientific knowledge or technical skill*, including all of the following: . . ." (italics added).].)  The routine administration of insulin outside of hospitals and clinical settings, the Association observes, does not require substantial scientific knowledge or technical skill and is, in fact, typically accomplished by the patients themselves, including some children, or by friends and family members.

We need not speak to the definition of nursing practice in order to resolve this case.  However broadly the NPA may define the practice of nursing, and whatever the NPA may correlatively prohibit as unauthorized practice, the NPA expressly exempts from that prohibition "[t]he performance by any person of such duties as required in . . . carrying out medical orders prescribed by a licensed physician . . . ."  (Bus. & Prof. Code, § 2727, subd. (e).)  This medical-orders exception, as we shall explain, is broad enough to cover unlicensed school personnel who act as volunteers for specific students, at their parents' request, to carry out physicians' medical orders in accordance with section 49423 and its implementing regulations.

### 2. The Medical-orders Exception.

The medical-orders exception provides in full as follows:  "This chapter [the NPA] does not prohibit:  [¶]  . . .  [¶] (e) The performance by any person of such duties as required in the physical care of a patient and/or carrying out medical orders prescribed by a licensed physician; *provided, such person shall not in any way assume to practice as a professional, registered, graduate or trained nurse*."  (Bus. & Prof. Code, § 2727, subd. (e), italics added.)  The meaning of the first clause and its application to this case are clear:  Unlicensed school personnel acting pursuant to section 49423 and its implementing regulations "perform[] . . .

13

duties as required . . . in carrying out medical orders . . . ." (Bus. & Prof. Code, § 2727, subd. (e).) What the italicized proviso means is less clear, especially in its use of the word "assume." On this point the legislative history is uninformative, reflecting only that section 2727 was added as part of the original NPA (Stats. 1939, ch. 807, § 2, p. 2349), and that the medical-orders exception was added on the Assembly floor for unrecorded reasons (Assem. J. (1939) p. 515).

The Nurses argue a person "assume[s] to practice as a . . . registered . . . nurse" (Bus. & Prof. Code, § 2727, subd. (e)) simply by performing any health care function that falls within the NPA's definition of nursing practice (*id.*, § 2725, subd. (b)). But this cannot be what the proviso means, as it would vitiate the medical-orders exception. A person who carries out a physician's medical orders with respect to a patient does not need an exception from the laws prohibiting unauthorized practice unless his or her conduct would otherwise violate those laws. To adopt the Nurses' interpretation would thus render the exemption entirely meaningless — a result we would hesitate to accept "unless absolutely necessary." (E.g., *People v. Arias* (2008) 45 Cal.4th 169, 180.) But we need not accept it. The statute's language, broader statutory context and interpretive history all point to a different meaning: To "assume to practice as a professional, registered, graduate or trained nurse" (Bus. & Prof. Code, § 2727, subd. (e)), means to hold oneself out, explicitly or implicitly, as being a nurse in fact.

We begin with the language. To "assume" to do a thing has two possible meanings in the present context. It might mean to "undertake" to do a thing, or "[t]o take [a thing] upon oneself" — in effect simply to do it. (Oxford Eng. Dict. Online (2013) definition II.4.a; see Webster's 3d New Internat. Dict. (2002) p. 133, definition 2.) Alternatively, to "assume" might mean "[t]o put forth claims or pretensions," to do a thing "in appearance only, . . . to pretend, simulate, feign." (Oxford Eng. Dict. Online, *supra*, definition III.8, 9; see Webster's 3d New

14

Internat. Dict., *supra*, at p. 133, definition 4.)  Building upon the former definition

("undertake"), the Nurses contend a person "assumes to practice as a . . . nurse"

(Bus. & Prof. Code, § 2727, subd. (e)) by undertaking to perform — in other

words, simply by performing — any of the patient care functions listed in the

NPA's definition of nursing (*id.*, § 2725, subd. (b)(2)).  This interpretation, as

noted, cannot be correct as it would leave the medical-orders exception without

meaning.

   In contrast, the medical-orders exception does have meaning if one

"assume[s] to practice as a . . . nurse" (Bus. & Prof. Code, § 2727, subd. (e)) by

holding oneself out, explicitly or implicitly, as being a nurse in fact.  The broader

statutory context supports this interpretation.  The list of statuses an unlicensed

person who carries out medical orders may not "assume" — "professional,

registered, graduate or trained nurse" (*ibid.*) —indicates that one may not evade

the rule against falsely posing as a registered nurse by substituting a vaguer term

such as "professional," "graduate" or "trained."  A penal provision enacted by the

same Legislature in the same bill as the medical-orders exception similarly

declared it "unlawful for any person or persons not licensed as provided in this

chapter to impersonate in any manner or pretend to be a professional nurse, or to

use the title 'registered nurse,' the letters 'R.N.,' or the words 'graduate nurse,'

'trained nurse,' or any other name, word or symbol in connection with or

following his [or her] name so as to lead another or others to believe that he [or

she] is a professional nurse." (*Id.*, former § 2796, added by Stats. 1939, ch. 807,

§ 2, p. 2356; see Bus. & Prof. Code, § 2796 [current version, adding "nurse

anesthetist" to the list of titles one may not falsely assume].)  The order in which

the bill's provisions were drafted suggests the Assembly looked to the penal

provision, and even borrowed some of its terms, in drafting the floor amendment

that added the medical-orders exception.  (Compare Assem. Bill No. 620 (1939

Reg. Sess.) § 2, p. 11, as introduced Jan. 13, 1939 [adding Bus. & Prof. Code, § 2796], with Assem. J. (1939) p. 515 [floor amend. of Mar. 13, 1939, adding Bus. & Prof. Code, § 2727, subd. (e)].)

The broader statutory context provides additional evidence supporting our conclusion. The same section of the NPA that contains the medical-orders exception (Bus. & Prof. Code, § 2727, subd. (e)) also creates a narrower exception covering "[i]ncidental care of the sick by domestic servants or by persons primarily employed as housekeepers *as long as they do not practice nursing within the meaning of this chapter*." (*Id.*, subd. (b), italics added.) Read in the context of the whole statute, the italicized language expresses the thought that domestic servants and housekeepers caring for sick persons may not perform nursing functions, without regard to how they hold themselves out. The Nurses would interpret the medical-orders exception similarly, yet the same Legislature, in the same act and section, chose the different words — "*assume* to practice as a . . . nurse" — (*ibid.*, italics added) to qualify the exception for unlicensed persons who merely carry out medical orders. The inescapable inference is that the Legislature, by using different words to define the two exceptions, intended them to have different meanings.

The single prior interpretation of the medical-orders exception is consistent with our conclusion. The Attorney General has described that exception, and the NPA's related penal provisions, as "show[ing] a legislative intent to prohibit any person from holding out to the public that [he or] she is specially trained or registered in the nursing profession unless said person is licensed by the state of California in this field." (*Registered Nurse*, 32 Ops.Cal.Atty.Gen. 159, 160 (1958), referring to Bus. & Prof. Code, §§ 2727, subd. (e) [medical-orders exception; unlicensed person carrying out medical orders may not assume to practice as a nurse], 2795 [unlawful to use any title, sign, card or device to indicate

16

nursing licensure], and 2796 [unlawful to use the titles "registered," "graduate" or "trained nurse," or the letters "R.N."].)  Thus, the Attorney General concluded, an unlicensed person employed by a physician as a "doctor's nurse" was forbidden to use titles confusingly similar to "registered nurse," such as " 'Registered Doctor's Nurse' or the abbreviation 'R.D.N.' or any title, or wear or display any pin that would indicate that said person is duly licensed as a registered nurse under the laws of the state of California." (*Registered Nurse*, *supra*, at p. 159; cf. *Kolnick v. Board of Medical Quality Assurance* (1980) 101 Cal.App.3d 80, 84 [declining to construe the exception].)

For all of these reasons, we conclude the medical-orders exception does permit a layperson to carry out a physician's medical orders for a patient, even orders that would otherwise fall within the definition of nursing practice, without thereby violating the rule against unauthorized practice.  To fall outside the exception by "assum[ing] to practice as a . . . nurse" (Bus. & Prof. Code, § 2727, subd. (e)), one must go further by holding oneself out, explicitly or implicitly, to be a nurse in fact.  This conclusion disposes of the issue, because unlicensed school personnel do not hold themselves out to be nurses simply by volunteering to act on behalf of particular students in accordance with the Education Code and its implementing regulations.

We thus proceed to consider the Nurses' remaining objections to the conclusion that such personnel may administer medications.

### 3. Medication-specific Statutes.

In statutes enacted between 2001 and 2011, the Legislature imposed additional training and administrative requirements before unlicensed school personnel may administer three specific emergency medications:  epinephrine auto-injectors to treat anaphylaxis (§ 49414, added by Stats. 2001, ch. 458, § 2, p. 4023), glucagon for severe hypoglycemia (§ 49414.5, added by Stats. 2003, ch.

17

684, § 1, as subsequently amended), and antiseizure medication for epilepsy (§ 49414.7, added by Stats. 2011, ch. 560, § 2). Each of these statutes, while expressing the Legislature's preference that registered nurses administer the subject medications whenever possible, expressly permits trained, unlicensed school personnel to do so when no nurse is available. (See §§ 49414, subd. (f)(1), 49414.5, subd. (a), 49414.7, subds. (a), (b).)

The Nurses contend these statutes would not have been necessary if the NPA's medical-orders exception already, by its own force, permitted unlicensed school personnel to administer medications. "[T]he Legislature," the Nurses observe, "does not engage in idle acts." (Citing *California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist.* (1997) 14 Cal.4th 627, 634.) The maxim is valid, but its application is flawed. Having generally authorized unlicensed school personnel to administer medications (§ 49423) and directed the Board to adopt implementing regulations (§ 49423.6), the Legislature nevertheless retained the power to impose additional restrictions on drugs deemed to justify special precautions. Nothing in section 49423 or 49423.6 conditioned the effectiveness of those statutes on further legislation, and nothing in the later-enacted, drug-specific statutes repeals the general authority granted in the earlier, more general provisions. So understood, none of the relevant statutes represents an idle act. In contrast, to accept the Nurses' argument would entail the implausible conclusion that the Legislature had intended section 49423 and its 1968 statutory predecessor (former § 11753.1; see *ante*, at p. 8) to lie dormant and ineffective until the Legislature enacted the first drug-specific statute 33 years later. (§ 49414 [concerning epinephrine auto-injectors].) History is to the contrary. As we have seen, the 1968 Legislature intended the original statute to be self-executing, and the 2000 Legislature, to force compliance, directed the Board

18

to adopt implementing regulations in short order. (See § 49423.6 ["[o]n or before June 15, 2001"]; see also *ante*, at p. 9.)

### 4. Failed Legislation.

Despite the foregoing evidence to the contrary, amici curiae supporting the Nurses urge us to infer from a variety of failed bills that the Legislature believes further, specific legislation is necessary before unlicensed school personnel may administer insulin. Because section 49423 and its implementing regulations plainly do authorize such personnel to administer prescription medications and were in fact adopted for that purpose, "to undertake the problematic exercise of inferring legislative intent from subsequent, failed legislation seems especially inappropriate . . . ." (*Martin v. Szeto* (2004) 32 Cal.4th 445, 451-452.) In any event, we find nothing in the failed bills' history that supports amici curiae's argument.

Assembly Bill No. 481 (2001-2002 Reg. Sess.) would have required school administrators and other designated, unlicensed personnel to be trained to administer insulin and required them to administer it, in the absence of a school nurse, in accordance with guidelines on diabetes care to be developed by a group of seven state and private organizations. The Governor vetoed the bill, explaining his reasons as follows: "Existing law already provides that any pupil who is required to take prescription medication during the regular school day may be assisted by school personnel if a written statement is obtained from a physician and a written request is made by the pupil's parent/guardian. [¶] This bill, while well-intentioned, would create a costly new state reimbursable mandate estimated by the Department of Finance to be potentially tens of millions of dollars. Neither this bill, nor the 2002 Budget Act contains an appropriation for this purpose." (Governor's veto message to Assem. on Assem. Bill No. 481 (Sept. 26, 2002) 6 Assem. J. (2001-2002 Reg. Sess.) pp. 8872-8873 [in relevant part].)

19

This history does not show the Legislature in 2002 — let alone in 1968 and 1976 when it enacted and reenacted the operative language of section 49423 — believed that further, more specific legislation was required to permit unlicensed school personnel to administer any prescription medication. To the contrary, the Legislative Counsel's Digest of the vetoed 2002 bill noted that "[e]xisting law provides that any pupil who is required to take . . . medication . . . may be assisted by the school nurse *or other designated school personnel*," and explained that the bill "would specifically make those provisions applicable to a pupil with diabetes" under guidelines to be developed later. (Legis. Counsel's Dig., Assem. Bill. No. 481 (2001-2002 Reg. Sess.), italics added.) The bill was, thus, analogous to other statutes in which the Legislature has imposed, for particular medications (e.g., epinephrine, glucagon and antiseizure medication), additional restrictions on schools' use of the general authority concerning medications granted in section 49423. The Legislature's unsuccessful attempt to impose comparable restrictions on insulin did not abrogate the existing general authority.

Three additional failed bills did not come to a vote. Senate Bill No. 1487 (2007-2008 Reg. Sess.) would have amended section 49414.5, which permits unlicensed school personnel with special training to administer glucagon in emergencies, to administer insulin under similar conditions. (Assem. Bill No. 1487, *supra*, § 1.) Another bill, Assembly Bill No. 1802 (2009-2010 Reg. Sess.), while expressly authorizing unlicensed personnel to administer insulin, would have permitted parents, rather than school administrators, to designate the school employees who would be allowed to administer insulin. (*Ibid.*, § 2.) Finally, Assembly Bill No. 1430 (2009-2010 Reg. Sess.) would have provided that no one other than licensed health care providers would be allowed to administer any medications in schools, except in emergencies. (*Id.*, § 2.) Because none of these bills came to a vote, and because the Legislature's cursory deliberations on them

20

postdated section 49423's enactment by decades, none provides a sound basis for inferring the 1968 and 1976 Legislatures' intents on the question whether section 49423 permits unlicensed personnel to administer insulin.

> 5. *The Department's 2005 and 2006 Advisory Statements.*

In 2005 and 2006, the Department issued advisory statements recommending that school personnel other than licensed health care providers not administer medications by injection generally (2005) or insulin in particular (2006). (State Dept. of Ed., Program Advisory on Medication Administration (May 2005) p. 7 < http://www.cde.ca.gov/ls/he/hn/documents/medadvisory.pdf > [as of Aug. 12, 2013] (2005 Program Advisory); State Dept. of Ed., Medication Administration Assistance in California . . . Frequently Asked Questions (2006) p. 1 (2006 FAQ).) The Nurses contend we should defer to these recommendations as authoritative interpretations of section 49423 by an agency charged with its enforcement. But the Department's advisory statements are not entitled to the same judicial deference as the binding, quasi-legislative regulations formally adopted by the Board. (Tit. 5, §§ 600-611; see § 49423.6 [regulatory authority].) "An agency interpretation of the meaning and legal effect of a statute is entitled to consideration and respect by the courts; however, unlike quasi-legislative regulations adopted by an agency to which the Legislature has confided the power to 'make law,' and which, if authorized by the enabling legislation, bind this and other courts as firmly as statutes themselves, the binding power of an agency's *interpretation* of a statute or regulation is contextual: Its power to persuade is both circumstantial and dependent on the presence or absence of factors that support the merit of the interpretation." (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7.)

Reviewing the 2005 Program Advisory and the 2006 FAQ under these principles, we find they lack persuasive force. Before explaining that conclusion,

21

however, we note those documents do not reflect the Department's current position. In their amicus curiae brief to this court, the Department and the Superintendent maintain that section 49423 and its implementing regulations (tit. 5, §§ 600-611), in combination with the NPA's medical-orders exception (Bus. & Prof. Code, § 2727, subd. (e)), do indeed permit unlicensed school personnel to administer insulin. With that clarification, we turn to the documents in question.

In its 2005 Program Advisory, the Department confirmed that unlicensed personnel may administer medications generally but "recommend[ed] that . . . unlicensed staff member[s] . . . not administer medications that must be administered by injection . . . ." (*Id.*, at p. 7.) The 2005 Program Advisory's recommendations are nonbinding, both because the document so states (*id.*, at p. 1) and as a matter of law. (See § 33308.5 ["Program guidelines issued by the [Department] shall be designed to serve as a model or example, and shall not be prescriptive"]; tit. 5, § 611 ["The [Department], with the approval of the [Board], may issue and periodically update an advisory providing non-binding guidance on the administration of medication . . . . The advisory shall be a program guideline under . . . section 33308.5 . . . ."].) The 2005 document offers no discussion or analysis of its recommendation concerning injections and cites no authority that might support it. The document does cite section 49423 and sections 600, 601 and 604 of title 5 (2005 Program Advisory, at p. 6), which, as we have seen, were specifically intended to permit unlicensed personnel to administer medications, and none of which forbids administration by injection. The document also cites statutes describing the specific licensure required of physicians, nurses and other health care providers employed as such in the schools (§§ 44871, 44873-44878), and also section 49422, which provides that only licensed health care providers and certain other persons with relevant credentials "shall be . . . employed or permitted to supervise the health and physical development of pupils . . . ." (2005

22

Program Advisory, at p. 6.)  As already noted, however, section 49422 cannot mean that only licensed health care providers may administer medications in schools because section 49423 expressly applies "[n]otwithstanding Section 49422."  (§ 49423, subd. (a).)

Unlike the 2005 Program Advisory, which the Department issued with the Board approval required for such documents (see § 33308.5 and tit. 5, § 611), the Department apparently issued the 2006 FAQ unilaterally.  In that document, the Department flatly asserts that unlicensed school personnel may not administer insulin.  (2006 FAQ, at p. 1.)  Ignoring its own conclusion just one year earlier that unlicensed personnel may administer medications generally, even if not by injection, the Department in the 2006 FAQ wrote that "[n]o . . . California statute" other than sections 49414 (epinephrine auto-injectors) and 49414.5 (glucagon) "allows an unlicensed school employee to administer *any other medication* in California public schools, even if the unlicensed school employee is trained and supervised by a school nurse or other similarly licensed nurse."  (2006 FAQ, at p. 1, italics added.)  In attempting to justify this conclusion, the Department inexplicably cited section 49423 (2006 FAQ, at p. 2, fn. 2) and omitted any reference to the statute's implementing regulations (e.g., tit. 5, § 604, subd. (b) ["Other designated school personnel may administer medication to pupils"]).

In its 2006 FAQ, the Department also invoked the NPA as authority for the following assertion:  "California law states, with a few clearly specified legal exceptions, that only a licensed nurse or physician may administer medication.  In the school setting, these exceptions are situations where [¶] The student self-administers the medication, [¶] A parent or parent designee, such as a relative or close friend, administers the medication, or [¶] There is a public disaster or epidemic."  (2006 FAQ, at p. 1, fns. omitted.)  The noted exceptions reflect statutory exceptions to the NPA.  (Bus. & Prof. Code, § 2727, subds. (a)

23

[gratuitous nursing by friends or family members], (d) [nursing services in emergencies].)  But the document entirely overlooks the medical-orders exception, which expressly permits "any person [to perform] . . . such duties as required in . . . carrying out medical orders prescribed by a licensed physician . . . ." (*Id.*, subd. (e).)

Viewing the 2005 Program Advisory and the 2006 FAQ in their full legal context, we conclude the documents' recommendations are not entitled to judicial deference to the extent they might be thought to preclude unlicensed school personnel from administering insulin.  The 2005 Program Advisory makes no serious effort to reconcile its recommendation concerning injections with the applicable statutes (§§ 49423, 49423.6) and binding regulations (tit. 5, §§ 601-611), and ignores the NPA's medical-orders exception (Bus. & Prof. Code, § 2727, subd. (e)).  The 2006 FAQ shares these faults and, in addition, both contradicts the 2005 Program Advisory's correct conclusion that unlicensed personnel may administer medications generally and also lacks the Board approval required for program guidelines.  (See § 33308.5; tit. 5, § 611.)  Under these circumstances, the documents' recommendations lack persuasive force on the question before us, and we thus do not defer to them.  (*Yamaha Corp. of America v. State Bd. of Equalization*, *supra*, 19 Cal.4th 1, 7.)  We recognize, however, that the 2005 Program Advisory constitutes an important source of advice for local education agencies on matters beyond the scope of this case, and we emphasize that we reject that document's recommendations only to the extent they contradict the views set out in this opinion.

*6. Conclusion.*

Finding no merit in the arguments to the contrary, we conclude California law does permit trained, unlicensed school personnel to administer prescription medications, including insulin, in accordance with written statements of individual

students' treating physicians, with parental consent (Ed. Code, §§ 49423, 49423.6; tit. 5, §§ 600-611), and that persons who act under this authority do not violate the NPA (see Bus. & Prof. Code, § 2727, subd. (e)). Because schools may administer prescription medications only in accordance with physicians' written statements (§ 49423; tit. 5, § 600, subd. (a)), state law in effect delegates to each student's physician the decision whether insulin may safely and appropriately be administered by unlicensed school personnel or instead whether a particular student's medical needs can be met only by a licensed health care provider. State law, however, presents no categorical obstacle to the use of unlicensed personnel for this purpose.

In view of this conclusion, we need not address the Association's contention that federal law would preempt a contrary rule.

### B. The APA.

The Nurses contend the 2007 Legal Advisory is ineffective on the theory the Department should have adopted it as a regulation in compliance with the APA. (Gov. Code, § 11340 et seq.) The superior court agreed with the Nurses on this point. The Court of Appeal, ruling for the Nurses on other grounds, did not reach the issue.

We also do not reach the issue, for two reasons: First, the Nurses forfeited the issue in this court by failing to file, in response to the petition for review, an answer raising it. (See Cal. Rules of Court, rule 8.500(a)(2).) While we have the power to address additional issues (*id.*, rule 8.516(b)(1)), the briefs touch upon the APA issue only cursorily, and we have not requested additional briefing (cf. Cal. Rules of Court, rule 8.516 (b)(2)).

Second, and more importantly, our holding that California law permits unlicensed school personnel to administer insulin authoritatively resolves the dispute independently of the 2007 Legal Advisory, based on the relevant

25

provisions of the Education Code and its implementing regulations. We therefore need not determine whether the Department violated the APA in adopting the 2007 Legal Advisory. Our decision leaves the Department free to revise the Legal Advisory to reflect California law as we have interpreted it, and leaves the parties and the lower courts free to identify and resolve, if necessary, any issues that may remain concerning APA compliance.

### III. DISPOSITION

The Court of Appeal's judgment is reversed and the case is remanded for further proceedings in accordance with the views set forth herein.

WERDEGAR, J.

WE CONCUR:

KENNARD, Acting C. J.
BAXTER, J.
CHIN, J.
CORRIGAN, J.
LIU, J.
McGUINESS, J.[*]

_____

[*] Presiding Justice of the Court of Appeal, First Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

26

*See last page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** American Nurses Association v. O'Connell

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 185 Cal.App.4th 393
**Rehearing Granted**

_____

**Opinion No.** S184583
**Date Filed:** August 12, 2013

_____

**Court:** Superior
**County:** Sacramento
**Judge:** Lloyd Connelly

_____

**Counsel:**

Remcho, Johansen & Purcell, Robin B. Johansen and Kari Krogseng for Defendants and Appellants.

Reed Smith, James M. Wood, Paul D. Fogel, Dennis Peter Maio; Disability Rights Education and Defense Fund, Inc., Arlene Mayerson and Larisa Cummings for Intervener and Appellant.

Remcho, Johansen & Purcell, Robin B. Johansen and Kari Krogseng for State Superintendent of Public Instruction Tom Torlakson and California Department of Education as Amici Curiae on behalf of Intervener and Appellant.

Jason D. Russell, Allen L. Lanstra, George C. Fatheree and Allison B. Holcombe for Los Angeles Unified School District, Children's Rights Clinic, Disability Rights Advocates, Disability Rights California, Disability Rights Legal Center, Disability Rights Texas and The Legal Aid Society-Employment Law Center as Amici Curiae on behalf of Intervener and Appellant.

Fagen Friedman & Fulfrost, Lenore A. Silverman, Kimberly A. Smith and Melissa L. Phung for California School Boards Association as Amicus Curiae on behalf of Intervener and Appellant.

Claire Ramsey; Morrison & Foerster, Miriam A. Vogel, Benjamin J. Fox, Sheila L. Sadovnik and Lindsay M. Andrews for Child Care Law Center as Amicus Curiae on behalf of Intervener and Appellant.

Cooley, Lori R. Mason, Maureen P. Alger, Brandon J. Kimura and Jon F. Cieslak for American Association of Diabetes Educators, the American Academy of Pediatrics Section on Endocrinology, California District of the American Academy of Pediatrics, The Endocrine Society and the Pediatric Endocrine Society as Amici Curiae on behalf of Intervener and Appellant.

U.S. Department of Education, Charles P. Rose, General Counsel; Thomas E. Perez, Assistant Attorney General (United States), Samuel R. Bagenstos, Principal Deputy Assistant Attorney General, Gregory B. Friel and April J. Anderson for United States as Amicus Curiae on behalf of Intervener and Appellant.

**Counsel:**

Pamela Allen, Brendan White; Alice L. Bodley, Jocelyn Winston, Maureen E. Cones; Pillsbury Winthrop Shaw Pittman, John S. Poulos, Carrie L. Bonnington and Kevin M. Fong for Plaintiffs and Respondents.

Cummins & White and Melanie L. Balestra for National Association of School Nurses, American Occupational Therapy Association, Inc., Arkansas School Nurses Association, Association of periOperative Registered Nurses, Association of School Nurses of Connecticut, California Association for Nurse Practitioners, California School Health Centers Association, California Teachers Association, Coalition of Labor Union Women, Colorado Association of School Nurses, Delaware School Nurses Association, Emergency Nurses Association, Florida Association of School Nurses, Georgia Association of School Nurses, Illinois Association of School Nurses, Illinois Nurses Association, Indiana Association of School Nurses, Iowa School Nurses Organization, Kentucky School Nurses Association, Maine Association of School Nurses, Maryland Association of School Health Nurses, Massachusetts School Nurse Association, Michigan Association of School Nurses, National Association of Pediatric Nurse Practitioners, National Association of State School Nurse Consultants, National Board for Certification of School Nurses, Nebraska School Nurse Association, Nevada State Association of School Nurses, New Hampshire School Nurse Association, New Jersey State School Nurses Association, New Mexico School Nurses Association, New York State Association of School Nurses, Ohio Association of School Nurses, Pennsylvania Association of School Nurses and Practitioners, Rhode Island Certified School Nurse Teachers, Rhode Island Institute for Nursing, Rhode Island State Nurses Association, School Nurse Organization of Arizona, School Nurse Organization of Idaho, School Nurse Organization of Minnesota, School Social Work Association of America, South Carolina Association of School Nurses, Tennessee Association of School Nurses, Utah School Nurse Association, Vermont State School Nurses Association, Virginia Association of School Nurses, West Virginia Association of School Nurses, Wisconsin Association of School Nurses and Wyoming School Nurses Association as Amici Curiae on behalf of Plaintiffs and Respondents.

Lisa C. Demidovich for United Nurses Associations of California/Union of Health Care Professionals NUHHCE, AFSCME, AFL-CIO as Amicus Curiae on behalf of Plaintiffs and Respondents.

Laura P. Juran; David J. Strom; Michael R. Clancy, Arnie R. Braafladt; Altshuler Berzon and Jeffrey B. Demain for California Teachers Association, American Federation of Teachers, California Federation of Teachers and California School Employees Association as Amici Curiae on behalf of Plaintiffs and Respondents.

Cummins & White, Karen L. Taillon; Vedder Price and Thomas G. Abram for National Council of State Boards of Nursing, Inc., as Amicus Curiae on behalf of Plaintiffs and Respondents.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Dennis Peter Maio
Reed Smith
101 Second Street, Suite 1800
San Francisco, CA  94105
(415) 543-8700

Maureen E. Cones
American Nurses Association
8515 Georgia Avenue, Suite 400
Silver Springs, MD  20910
(301) 628-5123

* Presiding Justice of the Court of Appeal, First Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.